Thank you, Your Honor. May it please the Court, my name is Jim Pusey from the law firm of Santoro Driggs, and I represent the appellant GCM Air Group. The Court's decision to grant summary judgment is reviewed de novo by this Court. As such, the summary judgment granted by the District Court should be overturned because there are genuine issues of material fact that exist in this case, and the District Court made several technical mistakes in its a few of the issues of material fact that exist in this case, any of which by themselves is sufficient for this case to survive summary judgment on your de novo review. First, the District Court held that GCM failed to provide any evidence that the remediation Chevron was and still is conducting upon GCM's two separate properties located near the most important gas station, which Chevron admits it contaminated, was being conducted in a timely, diligent, and reasonable manner. Did your client think it was buying parkland? No. My client was very, very well aware that there were two separate properties that he purchased. One was a gas station property of which he was aware of purchasing a gas station property, and the other one was a property that contained a restaurant. So he was aware of that. And aware of the ongoing remediation efforts? He was aware that there was contamination that occurred on the site, and the representations to him at the time of purchase were that remediation was ongoing, it was almost done, they would be out of there by 2005. That worked well in his time frame because there was a lease on the restaurant property. Once that lease expired, he was going to combine then the properties, the remediation   He would be able to sell the property. The lease would be complete, and he would be able to develop or sell the property. The properties are next door to each other? Yes, they are. They're contiguous. But they are separate with APNs, separate addresses. Everything about them is separate, other than the site. Didn't the district court, though, conclude that since Chevron had complied with the regulatory authority's request that there was really no material fact dispute as to the timeliness and diligence issue? Well, yes, but that assumes a couple of things. One is that assumes that the regulatory agency was relying entirely upon Chevron submitting proper and correct information. They weren't. In addition to the fact that there was erroneous borings and there were improper elevations, and the fact that they ignored that there was free product or oil and gas was actually floating on the water in monitoring wells. In addition to all of those things But wasn't the undisputed testimony of the regulatory official that the remediation was proceeding pursuant to the county's requirements? Well, two things. One is they weren't told about the 1981 spill. That's the only documented spill. If they don't have the right information, if they don't know when it happened, Chevron has represented that a spill happened in 1993. There's nothing in the record that indicates that. The only spill is from 1981. So if there is a 12-year gap where they don't know Well, what does 1981 got to do with anything? Well, 1981 is the source and the location of the plume. And the longer that a plume is in the ground, the longer the contamination plume grows. So it's impossible to say that this is a proper remediation technique if you don't know the source and location of the contamination. Was the 1981 spill at a different location than where the current remediation was taking place? The 1981 spill was at the same location, but given the very complex So if they're cleaning up the same location, they've got test drills and they're adds to the environmental problem. Well, two things. The 1981 spill, if it's there, if we don't know how long the contamination has been in the ground, we don't know how big the spill is. So we don't know where to put monitoring wells so we can put in an appropriate remediation system. To this day, they don't know where the contamination plume is. To this very day. Second of all is, in addition to that, is with all of the information that the governmental agency was relying upon, was relying upon improper surveys, was relying upon the groundwater flow going in the wrong direction. They were relying upon all that because all Chevron does is submit a report to them, they review that report, and then they say, okay, the report looks good to me. They don't have a way to independently verify it. So if they aren't getting the right information from Chevron, there's no way for them to know if this is being conducted in a normal manner. Well, you had these reports. Did you show in response to the motion for summary judgment in the district court that this somehow had a material effect on the regulatory requirements of the county? Absolutely. We pointed out what – first, we pointed out all the mistakes in our experts' own report, which the district court disregarded. Second of all is when the regulator himself, Mike Gazelle from Washoe County, said – first found out that there was a release in 1981 and it wasn't from 1993, he said, this fact makes me have a completely different idea of the amount or mass of contaminant that was released. So he didn't know about it until then. So all of the records, the documents that Chevron points to that says that the government was in agreement with what they were doing were done prior to Mike Gazelle ever knowing about 1981. Remind me what – what did he say, though, if anything, when asked in light of 1981 whether he thought Chevron was remediating consistent with the county's requirements in the time period we're currently talking about? Well, at the time that he was presented with that in his deposition, he was unable to because he was informed in the deposition for the very first time. Documents were handed to him, said, do you know the 1981 spell? The only position he could take at that time was to say that the mass is much different than I thought that it was. He wasn't – And was there something subsequent from him? We have not spoke with him, but his reports since that time have drastically  Excuse me for violating Judge Hawkins' rule. I'm cutting you off, but the question I have is – has been about the 1981 spill or leak, as it were, is whether that affected the county's view as to whether or not Chevron has been, regardless of the fact that there was an early or undisclosed spill, has been remediating the property sufficient for their regulations, and whether the fact that it may have caused him to re-evaluate, whether there's anything in the record to show that having now been made aware of the 1981 leak, he would change his views about whether or not they were complying with county regulations. Other than, Your Honor, other than his statement that it gives me a completely different idea of the mass of contaminant released, the only other thing there is, because you have to understand that summary judgment was granted shortly thereafter, and so we haven't had the opportunity to continue with discovery. So the answer is there's no testimony, there's no evidence in the summary judgment record as to Ezell's post-deposition view of whether or not Chevron is in compliance. Yes. Yes, there is. And the evidence would be this. They've moved from three monitoring wells to over 20 on the property. Okay. That suggests to me that Chevron was in compliance. Or that Chevron wasn't being truthful in the beginning. I think it's kind of a double-edged sword. They're in compliance now because they got caught. They were in the process of almost getting away with this. They almost snowed Washoe County. This relates to your client's claim that Chevron misrepresented things to them? Yes. Well, the entire complaint. But, yes, because it also runs to reasonableness of conduct under the contracts. And whether or not them disclosing 1981 breaches the maxim that all contracts must be conducted in a reasonable manner. But aren't they on the hook under the contracts to remediate the property? And if there's a – if the scope of the contamination is larger than was once thought, aren't they still required to clean up the expanded area of contamination? Yes, they are now. But what the crux of my client's position is, is had we – had Chevron had been truthful in the beginning and there was just a very short period of time in which they had to monitor things and they would be gone, then that was one of the key things that caused our client to buy the property. Had we known that we were going to be almost 30 years' worth of contamination and remediation later? I thought the district court concluded that that 2005 statement was after the transaction had closed. The 2005 statement that was referred to was then. But the 1981 spill wasn't. The refusal or the disabilities of them not telling GCM caused GCM to enter into a transaction they wouldn't have entered into. Wait, wait, wait. I want to make sure I understand your answer to that question. I thought Judge Tinkovich posited that the 2005 will be out by 2005 was after the transaction closed. The statement within the record, it was made on a couple of different occasions. It was made originally from Chevron to the realtor, which caused GCM to be okay with going through with the purchase. Later, the statement, they said that the remediation is almost completed. The specific statement that it will be gone by 2005 was made after the purchase. Okay. Can you address the issue on the statute of limitations? There are two properties here. Your complaint seems to blend the – well, and I understand the pleading matter. You call them, quote, the properties as a convention. The district court found that the statute of limitations had run and on your property damage and trespass claims, and the trespass, as I understand, that claim runs – does that run to both properties, to the – or to the restaurant property? That claim, Your Honor, runs specifically to the restaurant property. And that's when – And when did the – when do you contend you had notice that there was a trespass against the restaurant property? Short answer, after August of 2005, when Chevron went on to that property for the very first time, because they didn't have any other way to get on that property. They entered into an environmental agreement with my client, went on to that property and discovered the contamination at that time while they were on the property putting monitoring wells in the ground. That environmental agreement was entered into in August of 2005. So your statement is then you discovered that the trespass by the oil was after that. That's when you discovered it, even though it had preexisted? Yes. No one – no one knew of it prior to that time. The other thing I would like to take the opportunity to address is the district court's improper granting of attorney's fees. In this particular matter, the district court granted attorney's fees and costs to Chevron after the time that GCM had filed its amended notice of appeal. And, therefore, the jurisdiction just wasn't proper for the district court to go ahead and do it at that time. Now, in a lot of cases, the issuance of attorney's fees can be considered a ministerial function, and Chevron's argued that. But in this case, attorney's fees were awarded based upon the clause in the environmental agreement. Well, that clause in the environmental agreement, that's what's under appeal here. So it's not simply a ministerial function. The – also, the entire amount of attorney's fees that was awarded to Chevron was based upon that clause in the environmental agreement. And that clause in the environmental agreement only is concerning three of the 17 causes of action in the complaint. So that's how you would have had the district court try to make the requisite attempt to allocate three out of 17? Yes, if they would have had jurisdiction to go ahead and do it in the first place. Well, assume it had jurisdiction. So the allocation methodology that you proffered to the Court to consider was the three out of 17? Yes. I'd like to reserve the rest of my time, if I could. You may. Thank you very much. Honorable Circuit Judges, may it please the Court. Paul Johnson for Chevron USA, Inc. At the outset of counsel's argument, counsel alleged that there were genuine issues of fact and stated the Court that at the time of purchase that GCM was told that the remediation should be done in 2005. Now, subsequently in argument, counsel admitted, in fact, that that is a statement that was made after the purchase to GCM. Well, he said three things. He said there were representations to the realtor, statements to that effect, and then to – then there was an intermediate one. And then the one that he dramatically quoted that you're quoting, he said did happen after. So were there no representations with respect to an estimated end date around 2005 before that statement that counsel opened with? There is no evidence in the record of any statement, any predictive statement, that it was going to be done by 2005 or done shortly that was made prior to the purchase. There's nothing in the record. The reference here is a statement of the realtor. I note that repeatedly in opposition to summary judgment, in the briefing by GCM, and again in argument, that GCM does not cite to the record and does not provide specific evidence in the record by which we can reference these things. And the evidence that is cited, though, is to the statement by GCM's 30B6 witness, who, when asked about this, testified that this was in the 2003 to 2004 timeframe, and then again referenced this with respect to a 2005 timeframe at the time of the environmental agreement. And for the record references to that, I refer to the excerpts of record at pages 461 and 462 to 464. The real problem here is that GCM is arguing that they bought a pig in the poke. And, yeah, they knew they were buying a gas station property with some contamination, but Chevron did not provide adequate information as to the scope of the contamination and their ability to comply with a reasonable, timely cleanup schedule. And he points to two things they disclose. Chevron failed to disclose a 1981 spill and that they provided false statements in the environmental reports, misleading statements in the environmental reports, which they reviewed as a part of their due diligence. Why don't those two facts, why aren't they at least material that would get over summary judgment as to the negligence and breach of contract claims? Thank you, Your Honor. I'd like to take those in reverse order, if I may. As the district court found, GCM could not identify any. It's specifically in deposition, it's 30B6 witness, could not identify any factual misstatements. Now, the allegation of misstatement here is one of negligent misrepresentation. Well, I just heard Mr. Pusey give a litany of problems in the environmental reports. Well, Your Honor, there's not one of those not provided to the district court? No, Your Honor. And that's part of the problem here, as I've noted procedurally, that we don't have the citation of specific evidence in the record. The district court, unlike GCM's proposed rule and proposed standard, the district court did not have an obligation to go hunting through the record looking for genuine issues of fact. Now, GCM purports to argue that that is the standard, but it is not. But I do want to get to the substance, though. And it's in the record, at excerpts of record 1990 to 1995, where we have the questioning of GCM's 30B6 witness, where there could not be any identification of any factual misstatements. And the contention here is that it's one of factual misstatements. And that is the requirement under Nevada law with respect to a negligent misrepresentation claim. I also want to note that Chevron did not sell this property. GCM came to the property knowing it was contaminated, knowing it was under remediation. It received copies of some reports from Chevron, but these were reports that were always prepared by SECOR, Chevron's environmental consultant. Now, GCM's 30B6 witness says that over the course of the day he looked at these, he didn't really understand them. He did not turn them over to an environmental consultant of his own or conduct any due diligence on this issue. But there is no evidence of any factual misstatement in any of those reports. Now, GCM can come in here with its own environmental expert, its hired litigation consultant, and make arguments, well, Chevron should have been doing this or Chevron should have been doing that. But that's not the test. Was it commercially unreasonable for GCM not to hire an environmental consultant as part of its due diligence in the purchase? Yes. And that evidence is in the record, the testimony by Mr. Fennell. I do want to address, if the Court would like me to address that further, I'd be happy to do that. But we footnoted that testimony by Mr. Fennell in our brief. And we even noted his reference to a Nevada statute, that if the realtor does not have sufficient expertise, that the realtor has an obligation to refer the purchasing party to get an expert in that area. And the record is absolutely clear that GCM did not make any effort to conduct due diligence in this case before it bought the property. And I do want you to turn to the 1981 still, too. Thank you, Your Honor. That's what I would like to do also. Thank you. First of all, while these records that GCM submitted are unauthenticated from the Tahoe Regional Planning Agency, these records do show that Chevron promptly reported the release to the regulatory agency, that Chevron remediated the contamination, and that the agency approved Chevron's cleanup. And while we've referenced this in our brief, I'd like to walk through just a few of these pages. Did the prior owner of the property know about this bill? I don't know the answer to that, Your Honor. What I do know is that the records indicate that when Chevron reported the matter to the Tahoe Regional Planning Agency, that Chevron identified, named, telephone number, address, provided the owner information to the agency. There's no reference to the previous bill in the environmental agreement, correct, with the previous owner? No, I'm not aware of that. What I would like to do, though, is to address that. Why isn't that a material fact that GCM would, a reasonable purchaser, would have expected to hear from a tenant in Chevron's position? Well, first of all, Chevron has no obligation to provide information to the purchaser of the property. That's the issue for the seller. Now, Chevron cooperated, Chevron was asked, it provided copies of its reports, and these were reports concerning the remediation. And this is an important difference here. There's quite the argument about what may have happened historically at the property. But Chevron's obligation here is one of cleanup. And the reports that it provided concerned the remediation and what it was doing. In fact, while GCM argues that Chevron tried to get away with something, again, something that's not true and is not in the record, in fact, the claim here by GCM is it wanted Chevron off of the property. It wanted Chevron out of there to stop its cleanup so that it could sell the property free of any ongoing remediation efforts. It was a... The claim is that they were misled by silence or affirmative misrepresentation as to the scope of the contamination and, therefore, the ability of Chevron to clean it up in a reasonable period of time. Okay. With that, Your Honor, I'd like to walk through a couple of these facts here. First of all, to show that the 1981 contamination was, in fact, cleaned up. And actually, Anne, referring to the record at page... Just to understand. Okay. Are you going to try to persuade us that, contrary to what counsel has argued, that the size of the plume and the remediation plan, based on the later leakage or spill, has no impact at all on the scope and nature of remediation? Well, firstly, that's what the records would indicate from the Tahoe Regional Planning Agency in 1981. He says that's not what Mr. Ezell said. He said if he had known about that, that might have affected his approach, and he argues that they've, in fact, expanded the number of wells. I mean, the thing is, you're almost undercut to it. I mean, we have this whole ongoing offshore spill that, if anybody in this room isn't aware of it, I think we can take judicial notice that BP's estimates of the spill are much disputed, and it affects a whole bunch of things. And that's not to say that anybody's acting nefariously, but that it does seem that if the 1981 spill had any effect on the scope of the plume and it was not disclosed to the owner of the property, so that the owner of the property, the seller, as you say,  and the nature of the problem was understated because there was a failure to appreciate that this wasn't the first on the property, it was the second, and that the size of the plume or the scope of the remediation was bigger than people were led to believe. And what is, with respect to the restaurant property of interest to me, is that there would have been reason for them to worry about not only contamination on the gas station side, but on the restaurant side. So how do you disconnect the 1981 spill from all of those consequential issues? First of all, Your Honor, that it doesn't affect the cleanup. And whether the contamination occurred in 1993, and it's not that Chevron said the contamination occurred in 1993, but that's when it was discovered and when it was reported and the cleanup began. But it doesn't matter whether or not the contamination occurred in 1993 or 1990 or earlier. It's still the presence of the contamination and the cleanup. The monitoring issue is one of actually determining the existing conditions, and that is what the regulatory agency, the health department, has overseen with the monitoring wells at the site. So it doesn't matter, you know, what the date was. Now, one can... I'm still not sure I understand, because if you discover contamination on the property, you still have to make an estimate, do you not, as to what the size of the spill is, the size of the plume. And if it's assumed that it originated in 1993, it seems to me, and in fact it actually originated in 1981 and had not been, let's assume, not been remediated entirely, would that not affect the calculation of how likely the spill would have permeated through the subsurface strata? There's no evidence in the record of that. Well, isn't that just common sense? If it's been going on for, you know, a decade longer than was assumed, I think there would be a more likely larger area of contamination? Not necessarily, no. And it could be dissipation. It's the same location. And also we're talking about a period of going back to 1993. And so I think as a matter of common sense, if we can use that, Your Honor, then I think we're looking at an overlay here. Even assuming those facts, although there's nothing in the record that suggests it's reasonable to assume those facts, specifically when the record shows that the 81 was at a specific location and that all the soil was removed and the tanks were replaced. What I do want to point to is what Mr. Etzel did say. And counsel did not advise the court of this in responding to the court's question about this. And specifically, I would refer to pages 425 to 426. Again, 425 to 426 of the excerpts of record. And the question here to Mr. Etzel is, after he's been shown these 1981 documents by counsel for GCM, so the question is, you know, are they documents you would have an interest in? Answer, as far as cleaning up the site now, uh-huh, no. Answer, and it goes on. He says, because we know that there was a release up there. I mean, the evidence is there, and we are dealing with what we know. These are interesting documents from 81, which is when steel tanks were evidently removed from the ground and replaced with fiberglass, at which time they discovered they had a leaking tank due to corrosion, pitting, and maybe another issue. This knowledge doesn't change the cleanup. We still have to deal with the Safe Drinking Water Act, the maximum contaminant level. Where it came from is immaterial in dealing with it, you know, the problem. So that's the testimony from the regulatory agency. And the issue, the issue of this case is Chevron's obligation to cooperate and follow the directives of the regulatory agency. And that is precisely what Chevron has done throughout. Now, there's nothing that stops GCM from going to the regulatory agency and saying, we have additional information that we would like you to consider. And if you consider this additional information, maybe this will change what you direct Chevron to do. I know you're out of time, but could you turn for a moment to the restaurant property? And as I understand the state of the record, nobody knew that there was any contamination on that property until sometime long after the transaction here. Why doesn't the trespass and property damage claims with respect to that parcel survive? Those claims didn't accrue until they knew about the damage to the property. And that was different than what they might have known vis-à-vis the gas station property, which everybody concedes was contaminated. Well, a couple of things, Your Honor. First of all, that's not the way it was pled in the complaint. If the Court looks at the Second Amendment complaint, it will see there's an allegation, there are references to both parcels, but it says that there was contamination that Chevron caused contamination to the station property and that this migrated to the restaurant parcel. Well, that's the consequence. That's true. Yeah. But the claim, there are not 34 claims in the Second Amendment complaint. There are 17. And all claims are pled to the property generally. Secondly, and this is critical in terms of the procedural posture of the case, GCM did not raise this issue in opposition to summary judgment. The notion of splitting its claims as to the different parcels is what GCM raised in its motion for reconsideration, nominated a motion to alter or amend the judgment. The district court had its discretion not to consider that. Those new claims raised on a motion for reconsideration. And the district court did deny that motion. Aren't the tortious injury and negligence claims, though, fairly red to encompass the property separately? You know, there are different allegations in the complaint. There are slightly different injuries. No, Your Honor, because they didn't plead separate claims. It's true they referenced both parcels, but they pled it that way. And again, I emphasize that in opposition to summary judgment, they did not raise this distinction. And so therefore, you know, it's not an issue that Chevron was obligated to reply to, because they did not raise it in opposition to summary judgment. Well, they're saying that Chevron's, I'm reading from paragraphs 146 and 148, Chevron caused the contamination located on the station property, and the contamination has migrated to the restaurant property and potentially an adjacent parcel south of station property. Then it says, 147, Chevron's dilatory deficient and so on and so forth, attempts to remediate the station property have resulted in the plume of contamination invading the restaurant property. Failure to contain the plume and allowing it to migrate to the restaurant property has caused GCM to incur damages in excess of $75,000. Now, why doesn't that read as fairly be read as a claim for trespass against the restaurant property by preexisting contamination? It seems to me that's what it's focused on. I don't disagree that it could be read that way, but it also starts off with the claim, and this is consistent with the other claims, though, of Chevron causing damage to the property, including the station property. Well, right, because it is. So. Okay. We move for summary judgment. They didn't raise this issue in opposition to summary judgment. And it really gets to the point about knowledge and notice about the fact of injury versus the extent of injury. Migration to the restaurant parcel is about the extent. So we have your brief. Thank you. Thank you. If I may just briefly, Your Honor, I want to clear up a couple of things, if I could. First of all, the only release that has been documented is 1981. There wasn't a second release in 1983. They discovered the release in 1993. So if they're going to suggest that they did appropriate remediation in 1981, what the remediation consisted of was digging a bigger hole in the ground to put in a bigger tank. That's what it consisted of, and there is no one that can point to anything in the record that shows where there were monitoring wells that said this was adequate or it solved the problem. Mr. Rozell's testimony says we're dealing with the problem. We know there's contamination. We dug wells. In the context that it was asked, the question was, how does this change actually what you're going to do? Well, it doesn't change what you're going to do. You're still going to have to extract the gas. But what it does change is how big it is that you're looking at.  And the answer is, no. They still, to this day, don't know where the contamination flume is. Okay. Could you respond to the last point about whether you raised in your opposition to summary judgment distinctive claims as to the restaurant property? Well, for starters, in the summary judgment motion, there wasn't an allegation that there was going to be some kind of a bifurcation, if you will. So it wasn't raised in summary judgment. It just said that trespass should not be allowed. But we responded, yes, it should be allowed, and that was the extent of the argument. There wasn't at the time, which is very unique because Chevron suggested somehow we should have raised it in opposition, but that's not what they alleged in their summary judgment motion. Had they said that summary judgment should be granted concerning the restaurant property and concerning the station property, then we would have got into that distinction. There was never a distinction raised. That wasn't the basis of their summary judgment motion. Therefore, there was no need to raise that basis in an opposition. Okay. Thank you very much, Your Honor. Thank you, counsel. The case has already been submitted.
judges: Tymkovich, Hawkins, Fisher